UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MITZI F. DAVIS**,

Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY**,

Defendant.

Case No. 5:14 CV 1465

Judge Patricia A. Gaughan

REPORT AND RECOMMENDATION

Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff Mitzi Davis filed a Complaint against Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated July 2, 2014). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB on May 24, 2011 and SSI on May 31, 2011, alleging a disability onset date of January 11, 2011. (Tr. 234-48). Plaintiff's claim was denied initially (Tr. 182-97) and on reconsideration (Tr. 198-211). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 226-27). On January 23, 2013, Plaintiff (represented by counsel) and a vocational expert ("VE") testified at the hearing, after which Plaintiff was found not disabled. (Tr. 36-58; 61-89). On March 15, 2014, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481.

## FACTUAL BACKGROUND

***Personal and Vocational Background***

Born July 2, 1972, Plaintiff was 38 years old at the time of her alleged disability onset date. (Tr. 69, 234). Plaintiff lived with her husband and two children, ages thirteen and eight. (Tr. 69). Her past work experience involved only unskilled work. (Tr. 82).

Plaintiff testified at the hearing that she could not clean the bathroom or vacuum the floors and that her mother and grown daughter had to help her with the children and with tasks around the house. (Tr. 77-78). Plaintiff reported that during a typical day she would get her kids ready for school then would lie in bed or on the couch until she felt able to get dressed. (Tr. 283). After getting dressed, Plaintiff would watch TV until it was time to go to bed. (Tr. 283). Plaintiff did report that she could do a little cleaning and could prepare simple meals like sandwiches or frozen dinners, and that she could do the grocery shopping by herself although she might need a reminder. (Tr. 284-85).

***Medical Background***

Plaintiff generally challenges only the ALJ's conclusions regarding her mental limitations (Doc. 18) and therefore waives any claims about the determinations of her physical impairments. *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517-18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Additionally, Plaintiff's attorney agreed at the hearing before the ALJ that Plaintiff was physically limited only to light work, leaving her mental impairments as the only contestable issue. (Tr. 68).

Plaintiff saw her primary care physician, Minh-Ha Hoang, D.O., on January 6, 2011. (Tr. 424-25). Plaintiff was alert, oriented, with good eye contact and unimpaired judgment and insight. (Tr. 424). However, she appeared unwell, anxious, and depressed with a flat affect, psychomotor retardation, and reported that she was having hallucinations directing her to kill

herself. (Tr. 424). Dr. Hoang involuntarily admitted Plaintiff to the ER out of concern that her suicidal ideation and audio/visual hallucinations may cause her to harm herself. (Tr. 425).

Despite previously expressing to Dr. Hoang that she wanted to harm herself and her children, Plaintiff denied suicidal and homicidal ideation once at the ER. (Tr. 386). Plaintiff's drug screen was positive for amphetamines. (Tr. 387). She was diagnosed with psychotic disorder, not otherwise specified and admitted under the services of Dr. DiLauro for further evaluation and treatment. (Tr. 387).

Plaintiff saw Sharon DiLauro, M.D., on January 7, 2011. (Tr. 393). Plaintiff told Dr. DiLauro that she had gotten herself together and would like to go home. (Tr. 393). Dr. DiLauro discussed with Plaintiff how amphetamine use could lead to her decompensating like she had done the day before. (Tr. 393). Plaintiff denied any amphetamine use[1]. Dr. DiLauro assigned a global assessment of functioning ("GAF") score of 50[2], recommended follow-up treatment with medication, psychotherapy, social work and suicidal precautions. (Tr. 393).

At a psychological assessment on March 14, 2011, with Todd Edith, Plaintiff appeared well-groomed and was cooperative with a congruent affect and no reported delusions or suicidal/homicidal ideation although her mood was depressed and anxious. (Tr. 458). A psychological assessment on April 29, 2011, with Scott Schmitt, M.D., revealed similar findings

1. In her Brief on the Merits, Plaintiff notes she was taking Fluoxetine and Aplenzin (Bupropion), both of which have been known to cause false positives for amphetamines. (Doc. 15, at 2).

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 41-50 reflects Serious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

to the March exam with Dr. Schmitt noting that Plaintiff had reported her current medication was working well for her. (Tr. 463-67).

Plaintiff was evaluated by Zev S. Ashenberg, Ph.D., on July 8, 2011. (Tr. 433-36). Plaintiff told Dr. Ashenberg that her symptoms began in mid-2004 when she was pregnant with her third child and began suffering from "drastic uncontrollable mood swings". (Tr. 433). Plaintiff complained of symptoms of depression that had been going on since 2004 and included uncontrollable crying, loss of interest in previously enjoyable activities, insomnia, fatigue, feelings of guilt and worthlessness, and difficulty with attention, concentration, and decision-making. (Tr. 433). Plaintiff strongly denied suicidal intent despite reporting she had thoughts of death. (Tr. 433-34). Plaintiff also presented with significant anxiety symptoms including frequent panic attacks, fear of losing control, and fear of dying. (Tr. 434). She reported experiencing these symptoms from one time to multiple times per day. (Tr. 434). Plaintiff reported being fired from her most recent job in 2007, for showing up in her pajama top, stating, "I was pressured, I was late, and it was so hard to leave the house I didn't even realize what I was doing." (Tr. 434). She reported that thinking of returning to gainful employment caused panic attacks or sent her back to bed. (Tr. 434).

On examination, Plaintiff's affect was constricted and she appeared quite depressed. (Tr. 435). She occasionally fidgeted nervously and evidenced some anxiety but her predominant affect was depression. (Tr. 435). Plaintiff appeared to be within the normal range of intellectual functioning and her thoughts were lucid and coherent with no overt evidence of an underlying thought disorder. (Tr. 435). She responded to questions slowly and could not remember past presidents besides Obama and Bush even with prompting, and she could not perform serial 7's or 3's. (Tr. 435). When Dr. Ashenberg commented that one would expect a bank teller to be good

with numbers Plaintiff replied "that's what gets me so upset, I can't think straight or concentrate the way I used to." (Tr. 435). Dr. Ashenberg diagnosed Major Depressive Disorder and Panic Disorder without Agoraphobia and assigned a global assessment of functioning ("GAF") score of 39[3].

Dr. Ashenberg opined that Plaintiff's symptoms significantly interfered with her activities of daily living and quality of life. (Tr. 435). He said her concentration, pace, and comprehension appeared to be significantly impaired and she evidenced extremely low stress and frustration tolerances and would not do well in any type of environment that was around others or required tasks that had deadlines or other pressure. (Tr. 435). He opined that her difficulties with any kind of social activity or getting out of the house made it difficult to consider her for any type of vocational activity. (Tr. 435-36). He indicated that despite medication, Plaintiff's symptoms remained sufficiently severe to render her totally disabled and unable to engage in sustained employment. (Tr. 436).

On September 9, 2011, Plaintiff saw Michael Oros, M.D., at Coleman Behavior Health, who had previously seen her at an outpatient clinic and during inpatient hospitalization, for an examination. (Tr. 470-74). On mental status exam, Plaintiff was appropriately dressed with good hygiene, average cooperative behavior, and clear speech. (Tr. 471). She had a depressed mood that was stable and ranging from mild restriction to depressed. (Tr. 471). She had a logical thought process, unremarkable thought content with no evidence of suicidal/homicidal ideation, no cognitive impairment, and fair judgment and insight. (Tr. 471-72).Dr. Oros diagnosed

3. *See DSM-IV-TR*, *supra*, note 2. A GAF score of 31-40 reflects some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depress man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.* at 34.

Depressive Disorder and Adjustment Disorder with Mixed Anxiety and Depressed mood and assigned a GAF score of 60[4]. (Tr. 472-730).

In December 2011, Plaintiff began treating at Portage Path Behavioral Health. (Tr. 564). Her mental status examination was similar to prior examinations except that now she reported hearing people arguing in her basement and she knew it was Satan. (Tr. 564). She stated that Satan was following her around and when she went to the store and saw a car she believed it was him. (Tr. 564). She said this had been going on since 2004. (Tr. 564). Plaintiff was assigned a GAF score of 45[5].

On January 5, 2012, Plaintiff began seeing September Sloane, LISW, at Portage Path for individual counseling. (Tr. 543-44). On mental status exam, Plaintiff was adequately groomed with good eye contact and clear speech, however, she reported religious delusions, auditory and visual hallucinations, had a constricted/blunted affect and cooperative but withdrawn behavior. (Tr. 543). Plaintiff had poor insight and judgment but concrete thoughts. (Tr. 543).

When Plaintiff saw Ms. Sloane again on February 14, 2012, her mental status examination was similar, but she no longer reported hallucinations. (Tr. 541). Ms. Sloane advised her to discuss her continued symptoms of anxiety and depression at an upcoming appointment with her prescribing physician. (Tr. 541). Plaintiff continued therapy with Ms. Sloane through September 2012, although she did cancel a few appointments. (Tr. 537, 554, 556, 562, 592).

---

4. *See DSM-IV-TR*, *supra*, note 2. A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.* at 34.

5. *See DSM-IV-TR*, *supra*, note 2. A GAF score of 41-50 reflects Serious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

On June 23, 2012, Plaintiff saw Yuan-Hua Thakore, M.D. at Portage Path for medication management. (Tr. 557). Plaintiff reported her hallucinations were under control and, although she had an anxious mood on mental status exam, her insight and judgment were fair. (Tr. 557).

In September 2012, Ms. Sloane completed a Mental Residual Functional Capacity Questionnaire that was co-signed by Dr. Thakore. (Tr. 547-52). Ms. Sloane and Dr. Thakore opined that Plaintiff's abilities to remember work-like procedures, maintain attention for a two hour segment, maintain regular attendance, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday/week without interruption from psychologically based symptoms, perform at a consistent pace without an unreasonable number or length of rest periods, accept instruction and respond to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, understand, remember, and carry out detailed instructions, set realistic goals or make plans independently and deal with normal work stress were unable to meet competitive standards. (Tr. 549-50). Ms. Sloane and Dr. Thakore further opined that Plaintiff's ability to carry out very short and simple instructions was seriously limited but not precluded and that her ability to understand and remember very short and simple instructions, ask simple questions, and be aware of workplace hazards was limited but not precluded. (Tr. 549).

On September 20, 2012, state agency reviewing psychological consultant Aroon Suansilppongse, M.D., reviewed Plaintiff's medical records and opined Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, work in coordination with or proximity to others without being a distraction, complete a normal workday

and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number of rest periods. (Tr. 579-81). Further, Plaintiff was moderately limited in her ability to interact appropriately with the general public, accept instruction and criticism from supervisors, get along with co-workers without distracting them or exhibiting behavioral extremes, set realistic goals and plans independently of others. (Tr. 580-81). Aside from these limitations, Plaintiff was not limited in any other area. (Tr. 579-81). Dr. Suansilppongse opined Plaintiff had mood and anxiety disorders. (Tr. 581).

***ALJ Decision***

On February 4, 2013, the ALJ found Plaintiff had the severe impairments of degenerative disc disease, bipolar disorder, personality disorder, and a panic disorder; but that these impairments did not meet or equal a listing. (Tr. 36, 42-43). The ALJ then found Plaintiff had the RFC to perform a range of light work with the additional limitations that she could only occasionally stoop, crouch, or crawl. (Tr. 44). She was limited to simple, routine tasks that did not involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others. (Tr. 44). She could not perform work requiring strict production quotas, piece rate work, or assembly line work. (Tr. 44) She was limited to only occasional interaction with others and no interaction with the general public. (Tr. 44).

Next, the ALJ found, based on the VE testimony, that Plaintiff could perform work as a laundry worker, office helper, and cleaner; hence, she was not disabled. (Tr. 52-53).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in

the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff asserts the ALJ erred in assigning little weight to her treating sources' opinions. (Doc. 15, at 7-12). Specifically, Plaintiff argues the ALJ erred in rejecting the opinion of Dr. Ashenberg, as well as in rejecting the opinion of Dr. Thakore and Ms. Sloane. (Doc. 15, at 7-12). This argument gives rise to the well-known treating physician rule.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id*. When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion,

the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Importantly, the ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (*quoting* SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004).

**Dr. Ashenberg**

The ALJ assigned little weight to Dr. Ashenberg's July 2011 opinion that Plaintiff's symptoms significantly impaired her activities of daily living, concentration, persistence, and pace and left her with low stress tolerance and significant difficulty interacting with others, and that she would be unable to sustain employment. (Tr. 48-49). In so doing, the ALJ stated the opinion was based only on a singular event and was inconsistent with the record, in particular with the opinion of another treating source, Dr. Oros. (Tr. 49).

The ALJ's assessment is facially compliant with the treating physician rule. The ALJ decided not to assign controlling weight to Dr. Ashenberg's opinion because it was inconsistent with the record and further provided good reasons for the weight given, namely that it was inconsistent with the opinion of another treating source. (Tr. 49). The ALJ also found that it was based on a small period of time, only one office visit. (Tr. 49).

Plaintiff argues this was not sufficient because Dr. Ashenberg's opinion was consistent with the record as a whole. (Doc. 15, at 10). Plaintiff further argues the citation to Dr. Oros's records was not sufficient because those records include "summaries of visits" and not

assessments. (Doc. 15, at 10). And lastly, although Dr. Oros described Plaintiff's psychosis as "malingering", there was no basis for this in the record and further Dr. Oros never said Plaintiff exaggerated her symptoms anywhere else in the record. (Doc. 15, at 10-11).

Upon review, substantial evidence supports the ALJ's decision to assign little weight to Dr. Ashenberg's opinion. Despite the fact that Plaintiff's other doctors did not document that she was "exaggerating" her symptoms, Plaintiff denied psychotic symptoms at many of her medical appointments and frequently had much less severe symptoms than she did on the day she was examined by Dr. Ashenberg. This, coupled with Dr. Oros's opinion that Plaintiff was exaggerating her psychosis, is substantial evidence to support the ALJ's decision to give less weight to Dr. Ashenberg's opinion. (Tr. 458, 463-67, 470-74). Even if substantial evidence or even a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, at 336 F.3d at 477.

**Dr. Thakore and Ms. Sloane**

Plaintiff further contends that the ALJ erred in assessing the joint opinion of Dr. Thakore and Ms. Sloane which found Plaintiff's ability to maintain concentration and persistence, remember work procedures, interact with others, and maintain work pace and attention were markedly limited and left her unable to maintain the standards required of a competitive workplace. (Tr. 549-50). The ALJ assigned this opinion little weight because it was not consistent with Dr. Thakore and Ms. Sloane's own mental health assessments of Plaintiff. (Tr. 50). Specifically, the ALJ noted there were several appointments at Portage Path where Plaintiff denied experiencing hallucinations or suicidal ideation, consistently had good hygiene, cooperative behavior, and full affect despite her anxious mood. (Tr. 50, 541, 557, 592). Also,

despite an alleged increase in symptoms, Plaintiff medication had never been increased or changed since February 2012. (Tr. 50, 541, 557, 592). Additionally, Plaintiff was never advised to attend treatment more frequently or hospitalized. (Tr. 51). The ALJ further noted that despite the allegedly severe limitations in her daily living, Plaintiff was able to care for her children including taking them to school and medical appointments. (Tr. 51, 77-78, 283).

Plaintiff argues the ALJ's reasoning is not sufficient because it ignores the fact that Plaintiff continuously reported hearing the voice of Satan from her basement and reported low energy, sleep disturbances, and panic attacks. (Doc. 15, at 11).

Here, once again, the ALJ complied with the treating physician rule and provided good reasoning for assigning little weight to Dr. Thakore and Ms. Sloane's opinion, mainly that it was inconsistent with the medical evidence of record, and particularly the records at Portage Path. While Plaintiff is able to present other evidence in the record that points to a different outcome, ultimately, the numerous appointments where hallucinations and suicidal ideation were not reported, the lack of an increase in medication and treatment and the fact that Plaintiff had at least some ability to care for her children and maintain some activities of daily living provide sufficient support for the ALJ's determination. Once again, the court cannot overturn an outcome supported by substantial evidence, even if there is substantial evidence to the contrary. *Jones*, at 336 F.3d at 477.

In sum, the ALJ complied with the treating physician rule and provided good reasons, supported by substantial evidence; therefore the ALJ's decision should be affirmed.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB benefits applied the correct

legal standards and is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).